In re WUERTZ et al.

Patent Appeal No. 4247.

Court of Customs and Patent Appeals.

April 1, 1940.

Cullen G. Frey, of Wilmington, Del. (C. H. Biesterfeld, of Wilmington, Del., of counsel), for appellant.

Howard S. Miller, of Washington, D. C., for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting all of the claims, 1 to 5, inclusive, in appellants' application for a patent for an alleged invention relating to "Dyestuffs of the Anthraquinone Series," and more particularly to "new diacidylamino trianthrimides."

Claims 1 to 4, inclusive, define appellants' dyestuffs, whereas, claim 5 is directed to the process of preparing the same.

The appealed claims read:

Rejected Claims.

1. New compounds of the following general formula

wherein the second anthraquinonylamino group is attached in one of the positions 6 and 7 of the middle anthraquinone nucleus, and wherein one X in each of the end anthraquinone nuclei represents an acidylamino radical and the remaining X's represent hydrogen.

2. Compounds having the following general formula

wherein the second anthraquinonylamino group is attached in one of the positions 6 and 7 of the middle anthraquinone nucleus, and wherein R represents an aromatic radical.

3. Compounds having the following general formula

wherein the second anthraquinonylamino group is attached in one of the positions 6 and 7 of the middle anthraquinone nucleus.

4. The compound having the following general formula

5. The process which comprises condensing one mole of a heteronuclear-beta-beta-dihalogen-anthraquinone with 2 moles of a 1-amino-alpha-acidylamino-anthraquinone.

The references are:

Isler et al., 961,612, June 14, 1910;
German Patent (Bayer & Co.), 230,052, Jan. 14, 1911;
Kalischer, 999,798, Aug. 8, 1911;
Gassner, 1,667.848, May 1, 1928;
Mieg et al., 1,684,327, Sept. 11, 1928;
Mieg, 1,690,236, Nov. 6, 1928;
Heidenreich, 1,931,821, Oct. 24, 1933;
Hauser et al., 1,974,866, Sept. 25, 1934;
Hauser et al., 1,995,806, Mar. 26, 1935;
"Anthracene and Anthraquinone," by Barnett, pages 231 to 235, inclusive.

In order that the issues may be better understood, we reproduce the structural formula of an anthraquinone.

The figures 1, 4, 5, and 8 indicate alpha positions, and figures 2, 3, 6, and 7 indicate beta positions. Each of the letters "o" on the middle hexagon represents one atom of oxygen.

The appealed claims relate to trianthrimides, which are referred to in Barnett as "dianthraquinonylaminoanthraquinones" and in Isler et al. as "dianthraquinonyl-diamino-anthraquinone compounds." A trianthrimide is composed of three anthraquinones joined by two amino groups, and is distinguished from a dianthrimide (concerning which there is considerable discussion in the briefs of counsel for the parties, as well as in the Barnett reference) which consists of two anthraquinones joined by one amino group.

There are different trianthrimides, depending upon the position of the linkage of the amino groups, which may be in alpha or beta positions on the end anthraquinones and also on the middle anthraquinone.

In his statement to the Board of Appeals, the Primary Examiner, among other things, said:

"Applicants combine one molecule of a beta beta dihalogen anthraquinone with two molecules of an alpha amino anthraquinone, resulting in the union of three anthraquinone molecules in a chain by means of two amino (NH) groups (see Barnett page 232, lines 12 to 16, and page 235 Indanthrene Bordeaux R Extra).

"Applicants' specific trianthrimide differs from Barnett's Bordeaux R Extra only in having an alpha benzoyl amino group instead of the 6-chlor substituent on the amino anthraquinone starting material (pg. 235). It is noted that the same reference describes the effect of the presence of benzoyl-amino groups (lines 3 et seq.)."

The Barnett reference is a textbook on "Anthracenes and Anthraquinones." It discloses that trianthrimides and dianthrimides are both old in the art, and that the introduction of a "benzoyl-amino group" confers tinctorial properties.

It may be, as argued by counsel for appellants, that the author (Barnett) does not specifically state that the "benzoyl-amino group" may be introduced into trianthrimides. The question thus raised by counsel is not of vital importance, however, owing to the fact that other references hereinafter discussed clearly show the introduction of a "benzoyl-amino group" into trianthrimides.

Isler et al. disclose trianthrimides in their examples 3 and 5. In example 3 they disclose the same linkage as called for by the appealed claims. However, in that linkage they do not disclose the "benzoyl-amino groups" called for in appealed claims 3 and 4, the "acidyl-amino groups" called for in appealed claims 1 and 5, nor the "aromatic acidyl-amino groups" (which include the "benzoyl-amino groups," see Hackh "Chemical Dictionary," pp. 38, 66, and 108) called for in appealed claim 2. (It may be said at this point that it is our understanding that the acidyl-amino radical—group— is generic to and includes the aromatic acidyl-amino radical—group—and the benzoyl-amino radical—group). See Hackh, "Chemical Dictionary," pp. 14, 17, 38, 66, and 108. In example 5 Isler et al. show a trianthrimide in which they employ an

acidyl-amino radical. However, in that example the linkage extends from a beta position on the end anthraquinones to alpha positions on the middle anthraquinone; whereas, in appellants' dyes, as called for in each of the appealed claims, the linkage is from an alpha position on the end anthraquinones to beta positions on the middle anthraquinone.

Hauser et al., patent No. 1,974,866, in example 1, disclose a trianthrimide having the benzoyl-amino radicals in the same positions (alpha) on the end anthraquinones as called for by the appealed claims. Their trianthrimide differs from appellants', however, in that the two end anthraquinones have a different linkage; that is, they are attached to the same hexagon of the middle anthraquinone, one in an alpha position and the other in a beta position, whereas, appellants' end anthraquinones are joined in beta positions on opposite sides of the middle anthraquinone.

The Hauser et al. patent No. 1,995,806, in example 4, discloses a trianthrimide having the benzoyl-amino radicals in alpha positions on the two end anthraquinones as in the appealed claims. Their benzoyl-amino radicals, however, are attached in the fourth positions rather than in the fifth positions as in the trianthrimides called for in appealed claims 2, 3, and 4. (The patentees state that their dyestuff dyes cotton "strong bordeaux tints.") However, in appealed claims 1 and 5 the acidyl-amino radicals may be in the fourth, fifth, or eighth positions. Those claims, therefore, are broad enough to cover the benzoyl-amino radicals in the positions disclosed in that reference. The difference between the Hauser et al. disclosure and appealed claims 1 and 5 is that in Hauser et al. the linkages extend from a beta position on the end anthraquinones to alpha positions on the middle anthraquinone; whereas, in appealed claims 1 and 5 the linkages are from an alpha position on the end anthraquinones to beta positions on the middle anthraquinone.

The Heidenreich patent shows in example 2, instead of a trianthrimide, a dye in which the middle anthraquinone is replaced by an anthanthrone. The arrangement of the linkage of the benzoyl-amino radicals is the same as in appealed claim 4.

Appellants contend that an anthanthrone is a costly intermediate, and that the dyestuffs in which it is present do not dye the same shade as appellants.

Appellants' contention in that regard may be correct. However, as hereinbefore noted, the Heidenreich patent does disclose the linkage of the benzoyl-amino radicals in the same arrangement as that called for by appealed claim 4.

Mieg et al. 1,684,327, in their example 2 show a dyestuff having benzoyl-amino radicals on the end anthraquinones in the same position as in appellants' dyes. However, instead of showing a middle anthraquinone, as in appellants' dyes, the reference shows a phenanthrene-quinone. The phenanthrene-quinone of Mieg et al. differs from the middle anthraquinone in appellants' dye in that, among other things, the two oxygens are on the same side of the middle hexagon instead of on the opposite sides as in anthraquinones, resulting in a non-symmetrical arrangement of the hexagons. Appellants' objection to that reference is the same as their objection to the disclosure in the Heidenreich patent.

The German patent to Bayer & Co., No. 230,052, appears to be cumulative with respect to what is disclosed in the Isler et al. and the two Hauser et al. patents, and, therefore, need not be described here.

The Kalischer, Gassner, and Mieg (1,690,236) references were cited by the tribunals of the Patent Office in connection with "acid ring-closed compounds" formerly in appellants' claims but which, by amendment, have been eliminated. Those references, therefore, need not be considered here.

In holding that the appealed claims are unpatentable over the prior art, the Primary Examiner, among other things, said:

"Analogous anthrimide compounds (a plurality of anthraquinone molecules joined by NH groups) are shown by Isler, and the two Hauser patents. The Isler patent describes the Bordeaux R Extra and several other examples in which one molecule of a beta beta dihalogen anthraquinone is combined with two molecules of an alpha aminoanthraquinone to form corresponding trianthrimides.

*     *     *     *     *     *

"Hauser 1,974,866 likewise discloses a series of anthrimides containing three, four, or five anthraquinone, and containing benzoylamino groups in alpha positions on the terminal anthraquinone radicals. The claims here escape this reference (see claim 3 of the patent) only by requiring the two imino linkages on the middle anthra--

quinone radical to be on opposite sides, as in Isler or the Bordeaux R Extra.

\* \* \* \* \* \*

"Heidenreich shows as a starting material an anthrimide that differs from the present claims only in the use of an anthanthrone in place of the central anthraquinone radical, the reference example and the present case both showing benzoyl amino groups in alpha positions on the terminal anthraquinone radicals.

\* \* \* \* \* \*

"Claim 1, and the anthrimide aspect of claims 2, 3, and 4, were held to be unpatentable over the Bordeaux R Extra described by Barnett and by Isler, especially in view of discussion of benzoyl amino substituents, and the similarly situated benzoyl amino groups in the analogous starting materials of Meig 1,684,327, Heidenreich, \* \* \* and the final product of Hauser 1,974,866 and Bayer.

\* \* \* \* \* \*

"Claim 5 is directed to the single step of combining a molecule of a beta-beta-dihalogen anthraquinone with two molecules of an alpha amino anthraquinone as in Barnett (pp. 232 and 235) and in Isler. The sole point of differentiation being in the presence of an "alpha-acidyl amino" group. The result of this single process step is at once obvious and predictable from those references and is not even specified in the claim. This claim was rejected as without patentable merit over either Barnett or Isler."

In affirming the decision of the Primary Examiner, the Board of Appeals, in its original decision, held that the appealed claims covered no more than "should be obvious to those working" in the art in view of the disclosures in the references of record. In its decision rendered on appellants' petition for reconsideration, the board again referred to the references of record and stated, among other things, that, in its opinion, it would be obvious from the disclosures therein "that the benzoyl-amino group will effect the color of a dyestuff."

As we understand the decisions of the tribunals of the Patent Office, it was held that, although the appealed claims are not anticipated by any reference of record, the product and process defined in those claims, in view of the references cited, would be obvious to one skilled in the art.

Counsel for appellants contend that appellants have developed a new dye, which produces a new red-brown shade; that appellants' product is not anticipated by anything in the prior art; and that it was not obvious to one skilled in the art, but, on the contrary, required the exercise of the inventive faculties to produce it.

In view of the fact that example 3 in the patent to Isler et al. shows a dyestuff for dying cotton a Bordeaux red in which the trianthrimide is of the same linkage as that called for by the appealed claims (although in that example the patentees do not disclose the introduction of the acidyl-amino, aromatic acidyl-amino, or benzoyl-amino radicals) and that example 1 in the patent to Hauser et al., No. 1,974,866, shows a dyestuff for dying cotton a red-brown shade in which the benzoyl-amino radicals are in the same positions (alpha) on the end anthraquinones as are called for by the appealed claims (although the patentees' trianthrimide, as hereinbefore explained, has a linkage different from appellants), and as it appears from those references and others of record that it is old to introduce acidyl-amino radicals and benzoyl-amino radicals into trianthrimides, the question presented is whether the introduction by appellants of acidyl-amino, aromatic acidyl-amino, or benzoyl-amino radicals in the positions disclosed in the patent to Hauser et al., No. 1,974,866, to a trianthrimide having the linkage disclosed in example 3 of Isler et al. and thereby securing, according to an affidavit of record, a dyestuff which dyes cotton a shade of red slightly lighter than the Isler et al. Bordeaux red, involves invention, or, stated differently, whether, in view of the references of record, it involves invention to substitute the trianthrimide linkage disclosed in example 3 of Isler et al. for the trianthrimide linkage in Hauser et al., No. 1,974,866.

The issue presented involves highly technical factual matters, and it is well settled that in cases of this character concurring decisions of the tribunals of the Patent Office will not be disturbed, unless it appears that they are manifestly wrong. In re Henry Anhaltzer, 48 F.2d 657, 18 C.C. P.A., Patents, 1181, and cases therein cited; Berman v. Rondelle, 75 F.2d 845, 22 C.C. P.A., Patents, 1049.

We have given careful consideration to all of the arguments presented by

counsel for appellants, but are unable to hold on the record presented that the tribunals of the Patent Office reached the wrong conclusion.

The decision of the Board of Appeals is affirmed: